IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>KEVIN JACKSON,<br><br>               Petitioner,<br><br>v.<br><br><br>MARCUS HARDY, Warden, Stateville<br>Correctional Center<br>               Respondent. | Case No. 09 C 7774<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Petitioner Kevin Jackson ("Jackson") was convicted of murder and aggravated battery in 2003 in the Circuit Court of Cook County, Illinois. He is currently serving a 45-year sentence in Stateville Correctional Center in Joliet, Illinois under the supervision of current warden Marcus Hardy ("the State"). He filed a federal petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) on four grounds: (1) his conviction was based on prior inconsistent statements by witnesses that recanted their previous testimony at trial; (2) his trial counsel was ineffective because that attorney failed to investigate an alternative suspect; (3) his appellate counsel was ineffective because that lawyer did not argue his trial counsel was ineffective for not investigating the alternative suspect; and (4) the state courts applied an unduly harsh pleading standard to his first state collateral attack on his conviction. For the following reasons, the Court denies Jackson's habeas petition.

## I.    BACKGROUND

### A.    Underlying Facts,[1] Pre-Trial Statements, Trial Testimony and Verdict

#### 1.    The Murder

At approximately 1:30 am on May 6, 2001, Ernest Jenkins and his passengers Michael Watson ("Michael") and Stanley "Meechie" Watson ("Meechie") stopped at a Citgo gas station on the corner of 55th Street (Garfield Boulevard) and South Damen Avenue in Chicago, Illinois. Michael and Meechie got out of the car—Michael to pump gas, Meechie to pay for it—and shots rang out. Jenkins died, Michael was shot in the leg, and Meechie escaped harm. Michael provided the police with a description of the shooter's car. The police located the car; it was co-owned by Jackson and his cousin Manuel Stewart ("Stewart"). Jackson was arrested for the crime and tried for first-degree murder.

#### 2.    Pre-Trial Statements and Trial Testimony Summarized

Michael and four eyewitnesses, Stewart, Brandy Butler ("Butler")[2], Vernon Clay ("Clay"), and Shemika Mason ("Mason"), testified at trial. All four eyewitnesses made handwritten statements before the trial identifying Jackson as the shooter. All those statements indicated that the witnesses were treated well by the police, that the police did not promise anything in return for giving their testimony, and that the statements were not coerced. All four witnesses reviewed and signed their

---

[1] Jackson does not present clear and convincing evidence challenging the Illinois appellate court's statement of facts on Jackson's direct appeal of his conviction. *See* 28 U.S.C. § 2254(e)(1) (in a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," and only rebutted by clear and convincing evidence); *Rever v. Acevedo*, 590 F.3d 533, 537 (7th Cir.2010) (same). The Court presumes those facts are correct for purposes of its habeas review, and adopts the underlying facts as set forth by the Illinois appellate court in Jackson's direct appeal, *People v. Jackson*, No. 1-04-1784, (Ill. App. Ct. Apr. 19, 2006) (unpublished) (Doc. 16-5), as well as the appeal on his collateral attack on his conviction, *People v. Jackson*, No. 1-07-1680 (Ill. App. Ct. Apr. 29, 2009) (unpublished) (Doc. 16-14).

[2] Brandy Butler is also known as Brandy Grant in the underlying record. (*See* Doc. 16-14 at 3.)

respective statements, which were also signed by the prosecutor and detective who conducted the interviews. Before the grand jury, Butler, Clay and Stewart confirmed the accuracy and veracity of their handwritten statements and again identified Jackson as the shooter. However, at trial none of the four eyewitnesses identified Jackson as the shooter, and each recanted his or her earlier statement, claiming it was the product of police intimidation. Each was impeached by the prosecution with the his or her written statement and, in the case of Butler, Clay and Stewart, their grand jury testimony as well. Jackson offered no evidence at trial except a stipulation that the police found Jenkins in his car.

### 3. Butler

In her handwritten statement to the police and prosecutors and in her grand jury testimony, Butler stated that she was at the gas station with Jackson and three other companions (Quiana Davis, Stewart and Mario Brown). She confirmed that Jackson was a member of the Vice Lords gang, while Meechie was a member of a rival gang, the Gangster Disciples. While inside the gas station, she heard gunshots and saw Jackson fire a gun at Meechie and the car near Meechie. As she left the gas station, she saw the driver of the car slumped over.

However, at trial, Butler testified that she could not see the shooter and that Jackson was not at the gas station. She further testified that she was pregnant at the time, afraid of the police, and not treated well by them. Butler stated that detectives coerced her into implicating Jackson as the shooter by threatening her and refusing to let her leave the police station until she signed the statement. She also testified that the police told her what to say to the grand jury.

### 4. Clay

After the shooting, Clay told the police that he was at the gas station with Davis, Butler, and Mason during the shooting. Clay initially told police that Norman McIntosh, another Vice Lord, was the shooter. When the police re-interviewed Clay after they could not verify his story, he told them he could not remember implicating McIntosh and instead implicated Jackson. Clay told police that Jackson, Stewart and Davis came to the gas station together. At the gas station, Clay saw Meechie, who he knew was a Gangster Disciple, hugging Davis and whispering to her. Meechie asked Davis on a date, but Davis told Meechie that Jackson was her boyfriend. Clay saw Meechie make an inappropriate sexual gesture towards Davis. According to Clay, Jackson then shot at Meechie, who was on the passenger side of Jenkins' car. Clay saw Jackson fleeing the scene with a gun in his hand.

Clay later explained to the police that he wanted to stay at the police station overnight because he was afraid that Jackson and other Vice Lords would discover that he was cooperating with the authorities, and he would be "in some kind of danger." According to Clay, Jackson spoke with Clay shortly after the shooting and told him not to talk to the police; Clay took this as a threat. Clay also gave a statement to a prosecutor corroborating what he told the police. Clay admitted that he was a Vice Lord and that he witnessed Jackson shooting at Meechie and into the car.

At trial, Clay testified he was home asleep at the time of the shooting and that he never saw Jackson at the gas station. He said he knew nothing about the shooting until a detective told him about it at the police station. He claimed that he was kept in a room at the police station for an entire day and in custody for a total of three days. Clay further testified that police had threatened him with imprisonment if he refused to implicate Jackson, and threatened to put the word out that he was

cooperating with the police. He denied giving the written statement to the police and the prosecutor and denied initialing the statement on page three and signing it on page four. Clay admitted that the signature on page five was his, but stated that he had not read the document and thought that he needed to sign it in order to get his property back. He testified that he was driven by police officers to testify before the grand jury and that the police told him that if he did not answer "yes" to every question, that he "would never see the streets again." Clay denied telling a detective that he was withholding information due to fear of retaliation by Jackson and other Vice Lords. He also denied that Jackson confronted him after the shooting.

### 5. Stewart

After the shooting, Stewart initially told the police that Jackson was the shooter, admitting that he falsely identified Jackson as "Rick Party" in an effort to protect Jackson. Stewart later told the police that he and Jackson had gone to the gas station with Brown, Davis and Butler in the car that he and Jackson owned. He acknowledged that he and Jackson were both Vice Lords, and that they disapproved of Meechie, a Gangster Disciple, talking to Davis. Stewart saw Jackson shoot at Meechie and Jenkins being fatally wounded. He gave the same account in a statement recorded by prosecutors.

But at trial, Stewart denied that the gas station was in any particular gang's territory. He stated that he lied to the police when he said Jackson was with him at the gas station because Stewart was afraid that he would be charged with the murder. Stewart testified that only he, Brown, Butler and Davis went to the gas station that night to buy cigars. There, he saw Meechie and Davis talking, but another Vice Lord, "Rick Party," shot at the parked car. Stewart also denied telling detectives

about the shooting and stated that he lied both in his statement and to the grand jury when he implicated Jackson.

### 6. Mason

Mason told prosecutors she was with Stewart, Butler, Davis and Jackson the night of the shooting. She stated she went inside the gas station with Butler and Davis while Stewart and Jackson remained in the car. When she came out of the station, she saw Jackson, known to her as a Vice Lord, shoot at Meechie, who was unarmed and standing by the car with Jenkins inside. She also saw Michael hit the ground after being shot by Jackson. Later that day, Jackson warned her, Butler and Davis not to talk to talk to the police about the shooting.

At trial, however, she testified she was not at the gas station at the time of the shooting, and that she only found out about the shooting after Davis called her. After the call, Mason went to the gas station and met Davis and Butler there, but did not see Jackson there. She acknowledged talking to the police all night and meeting with a prosecutor to write out her statement. However, Mason stated that the police told her what to write and that they promised her they would "take care of" an outstanding warrant against her if she cooperated. She testified that she only signed the statement because she did not want to go to jail for the outstanding warrant. Further, Mason denied telling police that she went with Davis and Butler to buy cigars and that she saw Jackson talking to Meechie. She also denied telling the prosecutor about Jackson's gang affiliation and that Jackson shot at Meechie. She further denied that Jackson told Butler, Davis and her not to speak to the police after the shooting.

### 7.    Michael's Testimony at Trial.

At trial, Michael testified that he warned Meechie, a Gangster Disciple, that the gas station was located in the Vice Lords' territory.  Meechie did not heed Michael's warnings and walked to the gas station to pay for the gas.  When Michael exited the car to pump the gas, Jenkins was left alone in the car.  Then Meechie warned Michael, also a Gangster Disciple, that a Vice Lord was coming their way from about 120 feet.  A moment later, Michael was shot in the leg, and Jenkins was killed.  Michael was unable to identify the shooter from 120 feet away.  Michael further testified that the shooter as a small, thin, African-American weighing about 120 lbs, and that  Jackson "don't look nothing like the guy" because Jackson's complexion was too light.   However, Michael identified Jackson's car as the one where the shooter was sitting right before the shooting.

### 8.    Trial Testimony From Other Prosecution Witnesses

The investigating police detective testified that Michael and Meechie could not identify Jackson as the shooter from a photo array and a lineup.  At trial, a forensic investigator testified that he found six nine millimeter cartridge cases near Jenkins' car at the gas station.  He also recovered a fired bullet from the floor of the car.  A doctor testified that Jenkins died of multiple gunshot wounds and that the bullet that killed Jenkins passed through the victim's body from left to right.

### 9.    The Verdict

The jury initially indicated that it was deadlocked after seven hours of deliberation, but reached a verdict the next day, July 25, 2003.  The jury found Jackson guilty of the first-degree murder of Jenkins and the aggravated battery of Michael with a firearm.

### B. Post-Trial Proceedings and Direct Appeal

#### 1. Hearing on Jackson's Motion for a New Trial and His Sentence

Jackson filed a motion for a new trial, asserting a week after his conviction, Rick "Party" McShane visited him in jail. Jackson stated that during this visit, McShane apologized to Jackson and admitted he shot Jenkins and Michael. Jackson also stated that his conversation with McShane was overheard by another inmate, Duan Armfield, who was visiting with his girlfriend Holly Miles nearby. In support of these allegations, Jackson attached a copy of his jail records showing that McShane visited him on July 30, 2003. He also attached two reports by the public defender's investigator, who recounted her conversations with Jackson, Armfield and McShane. Even though the State produced Armfield's jail visitation log, which showed Armfield did not have any visitors the day he allegedly overheard McShane confess to Jackson, the trial court held an extended hearing on the matter.

At the hearing, the prosecutor's investigator testified to three interviews. First, he spoke with Armfield, who told the investigator that he overheard McShane tell Jackson "my bad; I am sorry. Lord told me those n-ggers were in a brown car. I am sorry. I was drunk." Second, he testified that he interviewed Miles, but she denied overhearing the conversation and said that Armfield was never distracted by other conversations during their visits. Miles confirmed in her own testimony at the hearing that she had never seen Jackson before and did not overhear a conversation about a murder. Third, he testified that he spoke with McShane, who denied committing, or admitting to, any murder. Then McShane testified. He said he visited Jackson in jail because they were friends and had not seen each other in a long time, but denied that he admitted to a murder, talking about a brown car, apologizing to Jackson or talking about being drunk. He acknowledged he was known as "Rick

Party." The prosecution also offered a written statement from Stewart to the public defender's investigator, dated two months before the trial, identifying "Rick Party" as the shooter and recanting Stewart's prior statements to the police, prosecutors and grand jury incriminating Jackson.

Jackson's counsel also called witnesses. The public defender's investigator stated that she also spoke to Armfield, who told her he heard McShane say to Jackson: "I was drunk and I was high. You got convicted. I am sorry. I will make it up to you." The defense called Armfield, who testified he overheard McShane's incriminating apology and offer to give Jackson money. On cross-examination, however, Armfield admitted that he failed to tell the prosecutor's investigator that McShane explicitly admitted to shooting Jenkins and Michael or that McShane offered Jackson money. Armfield further testified that he overheard the conversation from three seats away despite the thick glass separating visitors and inmates and the noise from the other eighteen people having conversations in the visiting room that day.

The trial court denied Jackson's motion for a new trial. The court held that the evidence suggesting McShane was the shooter was not new evidence warranting a new trial because Stewart had told the public defender's investigator about McShane at least two months before the trial. The trial court also found that Armfield's testimony was not corroborated by Miles, and that the conversation Armfield allegedly heard was not specific enough because it failed to include any names or dates. The judge sentenced Jackson to 45 years in prison for the murder and six years for the battery, to run concurrently.

## 2.    Jackson's Direct Appeal

On direct appeal, Jackson argued that:

1.    the State failed to prove his guilt beyond a reasonable doubt because his
      conviction solely rested on prior inconsistent statements;

2.    the trial court improperly admitted handwritten statements of four witnesses
      as prior inconsistent statements;

3.    the prosecutor made improper and inflammatory statements about street
      gangs in his closing, suggesting that Jackson and other gang members
      intimidated witnesses; and

4.    the Illinois firearms enhancement, which added 25 years to Jackson's
      sentence, violated the Illinois constitution.

(*See* Doc. 16-2.)

The state appellate court, while noting that there were two different lines of Illinois appellate

cases as to whether prior inconsistent statements alone could sustain a conviction, agreed with the

more recent opinions, holding such statements could show a defendant was guilty beyond a

reasonable doubt. The court reasoned that "a per se rule that a prior inconsistent statement, alone,

may not sustain a conviction is too rigid and deprives the trier of fact its role of evaluating the

credibility of witnesses." (Doc. 16-5 at 16.) The court further held that since there was physical

evidence of the bullet's trajectory and the location of the recovered casings, which supported the

accounts of Butler, Mason and Stewart, their prior inconsistent statements were corroborated. (*Id.*

at 16.) The court concluded that "a rational jury could have found that Jackson was the shooter" and

that it must presume the jury took the inconsistent testimony into account when determining the

recanting witnesses' credibility. (*Id.*)

The appellate court reviewed the prosecutor's closing argument for plain error because

Jackson conceded that he failed to properly preserve the argument for appeal. (*Id.* at 18.) In this

plain error review, the court held that the prosecutor reasonably inferred from the changing

testimonies that the witnesses had been intimidated. (*Id.* at 19-20.) This inference was supported by some of the witnesses' previous testimony that Jackson warned them not to cooperate with the police and Clay's earlier statements that he felt he was in danger for cooperating with the police. (*Id.*) In addition, the court held that the defense invited such conclusions due to its suggestion that witnesses' recanted testimony was the product of police coercion; the State provided a reasonable alternate theory for the recantations during their closing argument. (*Id.*) Furthermore, the references to street gangs were warranted due to the evidence that the shooting was gang-related. (*Id.* at 20-21). The appellate court also held that the trial court did not abuse its discretion in admitting the prior statements because they were inconsistent, not consistent, with the trial testimony (*id.* at 23-25), and that the sentencing enhancement statute did not violate the Illinois constitution. (*Id.* at 25-26).

Jackson filed a petition for leave to appeal (PLA) to the Illinois Supreme Court raising one issue: whether a criminal conviction can be based solely on uncorroborated prior inconsistent statements. (Doc. 16-6 at 11-20.) The Illinois Supreme Court denied leave to appeal on September 27, 2006. (Doc. 16-7.)

### C.    Post-Conviction Petition

Jackson then filed a *pro se* post-conviction petition under the Illinois Post-Conviction Hearing Act (725 Ill. Comp. Stat. 5/122-1 *et seq.*). His petition was supported with unsigned affidavits allegedly from Davis, Brown and Meechie; the trial court summarily dismissed the petition as "patently without merit." (Doc. 16-14 at 1, 10-11.) Jackson appealed to the state appellate court, this time represented by counsel, and argued that:

1.    his attorney on direct appeal was ineffective for failing to argue that his trial court counsel was ineffective for failing to investigate and present evidence that McShane was an alternate suspect;

2. his attorney on direct appeal was ineffective for failing to argue that trial counsel was ineffective for not calling Meechie as a witness;

3. his trial counsel was ineffective for failing to call Davis and Brown to testify; and

4. his trial counsel was ineffective for failing to investigate and present evidence that Mason had an outstanding warrant for her arrest, which corroborated her trial testimony that her identification of Jackson stemmed from fear of arrest.

(*See* Doc. 16-8.)

The appellate court held that Jackson had forfeited all these assertions and, in any event, they lacked merit. (Doc. 16-14 at12-20.) First, the court found that Jackson's post-conviction petition did not argue *appellate* counsel was ineffective for failing to assert trial counsel's ineffectiveness on various issues, and Jackson could not raise the appellate lawyer's alleged ineffectiveness for the first time on appeal. Second, the court held that the underlying allegations of trial counsel ineffectiveness could have been, but were not, raised on direct appeal and therefore forfeited. In any event, according to the appellate court, his counsel had no obligation to present evidence sufficient to convict another suspect. Further, Jackson's attachment of the three purported affidavits to his post-conviction petition was insufficient under Illinois law to support an ineffective assistance of counsel claim because the affidavits were unsigned. The appellate court affirmed the trial court's summary dismissal, issuing an initial opinion on March 4, 2008 (Doc. 16-11), and second opinion on April 29, 2009 after denying petitioner's timely petition for rehearing (Doc. 16-13).

Jackson then filed another PLA repeating the four claims raised in the state appellate court. (Doc. 16-15.) The PLA acknowledged that the post-conviction petition did not fully bring a claim of ineffective assistance of appellate counsel, but contended that a heading in the post-conviction

petition held the gist" of a claim that appellate counsel was ineffective. (*Id.* at 16.) On September 30, 2009, the Illinois Supreme Court denied leave to appeal. (Doc. 16-16.) On October 20, 2009, Jackson filed a motion for leave to file a motion to reconsider the denial of his PLA (Doc. 16-17), but the Illinois Supreme Court denied that as well on November 12, 2009 (Doc. 16-18).

### D. The Instant Habeas Petition

On December 14, 2009, Jackson filed the instant *pro se* petition for federal habeas relief under 28 U.S.C. § 2254(d), raising four grounds:

1. Jackson's conviction was based on recanted witness testimony and thus there was insufficient evidence to support such convictions beyond a reasonable doubt;

2. Jackson's trial counsel was ineffective for failing to conduct any pretrial inquiry into the existence of an alternative suspect, McShane;

3. Jackson's counsel on direct appeal was ineffective for failing to argue on appeal that trial counsel was ineffective for failing to conduct the pretrial investigation discussed above; and

4. the state courts used too stringent a pleading standard for the first-stage post-conviction summary dismissal.

(Doc. 1.) The State concedes that Jackson has exhausted all of his state-court remedies and that his petition is timely.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that federal habeas relief cannot be granted unless the state court's decision was contrary to, or an unreasonable application of, federal law clearly established by the Supreme Court. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 403 (2000); *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (holding "[i]f [the AEDPA's] standard is difficult to meet, that is because it was meant to be . . .

Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems.") (internal citation omitted). Under the "contrary to" prong of this standard, Jackson must demonstrate that "the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite [to the Supreme Court's]." *Williams*, 529 U.S. at 405. Under the "unreasonable application" prong, a petitioner must show that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005); *see also Williams*, 529 U.S. at 410 (an unreasonable application of federal law is different from an incorrect application of federal law); *Richter*, 131 S. Ct. at 785 (noting the distinction between how a federal court reviews a constitutional claim on direct appeal and the "unreasonableness" inquiry on habeas review). A state court's decision must lie "well outside the boundaries of permissible differences of opinion" to be found objectively unreasonable. *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009) (citation omitted).

## III. DISCUSSION

### A. Claim One: Insufficient Evidence to Sustain Conviction

Jackson is entitled to a writ of habeas corpus if the Illinois courts' decision was contrary to, or an unreasonable application of, *Jackson v. Virginia*, 443 U.S. 307 (1979), the relevant Supreme Court precedent for determining the sufficiency of the evidence to sustain a conviction. *See Richter*, 131 S. Ct. at 785; *Johnson v. Bett*, 349 F.3d 1030, 1034 (7th Cir. 2003) (noting that *Jackson* is the "clearly established law" at issue when a petitioner asserts the evidence was insufficient to convict

him).[3]   Under *Jackson*, the evidence is insufficient to sustain a conviction when, viewing the evidence presented at his trial in the light most favorable to the verdict, no rational jury could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319. The reviewing court only looks to see if the prosecution presented evidence that satisfies the elements of the crime - it does not "weigh the evidence or [] second-guess the trier of fact."  *United States v. Smith*, 576 F.3d 681, 686 (7th Cir. 2009) (noting that a conviction will be overturned "only if the record is devoid of evidence from which the trier of fact . . . could have found guilt beyond a reasonable doubt.") (internal citation and quotations omitted).

Jackson cannot show the Illinois court's determination that the evidence is sufficient was unreasonable.  The prosecution presented evidence from four witnesses, in the form of signed statements and grand jury testimony, that Jackson intentionally shot in the direction of Jenkins' car and Watson at the gas station, and that both men were shot, Jenkins fatally.  That evidence is sufficient to convict Jackson of first degree murder and aggravated battery under Illinois law.  *See* 720 Ill. Comp. Stat. 5/9-1 (listing the elements of first-degree murder); 720 Ill. Comp. Stat. 5/12-4 (listing the elements of aggravated battery).  Jackson's petition goes into detail regarding the witnesses' testimony at trial and essentially argues that the jury should have credited that testimony,

---

[3]The State interpreted Jackson's petition to argue that *the type* of evidence used to convict Jackson, namely prior inconsistent statements, was insufficient as a matter of law and in conflict with federal constitutional standards.  (Doc. 15 at 20.)  However, in his reply, Jackson confirmed he is challenging the sufficiency of the evidence of his conviction under *Jackson*.  (Doc. 20 at 2.)  To the extent Jackson challenges whether prior inconsistent statements are sufficient as a matter of law, he identifies no clearly established Supreme Court precedent violated by the Illinois trial and appellate courts when they upheld his conviction based on prior inconsistent statements.  *See Richter*, 131 S. Ct. at 786 (noting "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.")  Rather, whether he can be convicted using primarily prior inconsistent statements is an issue of state law and this Court will not consider it in this habeas proceeding.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (holding it "is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *see also Bates v. McCaughtry*, 934 F.2d 99, 103 (7th Cir. 1991) (reiterating "[a] federal court may not issue the writ on the basis of a perceived error of state law" and *Jackson* cannot be used "as a back door to review of questions of substantive law.")

not the prior inconsistent statements. But credibility is not the inquiry under *Jackson*. The jury, who was in the position to best judge the truthfulness and credibility of the witnesses by observing their demeanor when testifying, chose to credit the witnesses' first statements, made close to the crime, rather than the witnesses' recanted testimony later on. That is the jury's prerogative, and it was not unreasonable for the Illinois court to refuse to second guess it.

### B. Claim Two: Ineffective Assistance of Trial Counsel

Next, Jackson asserts that his trial counsel was ineffective because that attorney failed to investigate McShane ("Rick Party") as an alternative suspect. (Pet. at 15.) A "habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted on that claim." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004); *Crockett v. Hilick*, 542 F.3d 1183, 1192 (7th Cir. 2008) (same). Procedural default prevents a federal habeas court from considering the merits of a claim where "that claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law procedural grounds . . . ." *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004); *see also Brooks v. Walls*, 279 F.3d 518, 523 (7th Cir. 2002) (noting "the independent-and-adequate-state-ground doctrine is one of long lineage, founded not only in respect for state tribunals but also in recognition that litigants should be given incentives to present their contentions as soon as possible, when errors can be avoided, rather than to save them up for presentation after the error has been committed."). "Typically," a state court creates adequate and independent state grounds "when the petitioner failed to comply with a state procedural rule and the state court relied on that procedural default to refrain from reaching the merits of the federal claim." *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). The Court reaches the merits of Jackson's procedurally defaulted

claims if he establishes both cause for, and prejudice resulting from, the procedural default, or that it would be a fundamental miscarriage of justice if the Court refused to hear the claims because Jackson demonstrates he is actually innocent. *See House v. Bell*, 547 U.S. 518, 536 (2006); *see also Miranda*, 394 F.3d at 992 (same).

### 1.       Procedural Default

When Jackson appealed the state trial court's denial of his post-conviction petition, the Illinois appellate court found that Jackson's claim for ineffective assistance of trial counsel was procedurally defaulted because he did not raise it on direct appeal.  (*See* 16-14 at 13; citing *People v. Harris*, 862 N.E.2d 960, 966-967 (Ill. 2007) and holding "a postconviction proceeding is limited to constitutional matters that have not been, nor could have been, previously adjudicated.") This procedural default extends to Jackson's federal petition.  *See Brooks*, 279 F.3d at 523 (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977) and holding "a defendant's failure to assert his constitutional contentions at the time, and in the manner, required by state law forfeits any entitlement to federal collateral review of those contentions" unless the petitioner can show cause and prejudice or a miscarriage of justice); *see also Thomas v. Gilmore*, 144 F.3d 513, 518 (7th Cir. 1998) (finding procedural default where the Illinois Supreme Court found an issue had been waived).[4]

---

[4]Though Jackson did not raise the issue, the Court notes an Illinois state court's review of the merits for purposes of excusing his waiver does not change the independence and adequacy of the procedural default.  *See Brooks*, 279 F.3d at 523 (finding this review of the merits does not "abandon[] the procedural ground but . . . instead add[s] a substantive failing to the procedural one.").

## 2.    Excusing Procedural Default

Though he states "there's a strong possibility the petitioner is innocent," Jackson does not present evidence, new or otherwise, that he is actually innocent of the Jenkins murder and battery against Watson.  He recounts the evidence of McShane's involvement that was previously presented at his post-trial hearing and the testimony of the eyewitnesses at trial.  That evidence does not demonstrate he was actually innocent.  *See Schlup v. Delo,* 513 U.S. 298, 324, 327 (1995) (noting only "extraordinary" cases meet the "actually innocent" prong and listing examples of sufficient evidence, including "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."); *see also Briley*, 390 F.3d at 521-22 (summarizing the evidence and finding that evidence did not suggest the petitioner was actually innocent).  Only one person beside Jackson—Armfield—said McShane admitted to the crime; the others involved, including McShane, stated conclusively that McShane did not admit to it.  Moreover, there is reason to believe that Armfield was not in a position to overhear the jailhouse conversation between Jackson and McShane, given that he was some distance away and Jackson and McShane were separated by thick glass.  That leaves cause and prejudice.

Jackson suggests a cause for his procedural default: his appellate counsel was ineffective because that counsel did not raise trial counsel's ineffectiveness.  *See Lewis*, 390 F.3d at 1026 (noting that "[a] meritorious claim of attorney ineffectiveness might amount to cause for failure for the failure to present an issue to a state court . . . " and finding that failure to raise ineffective assistance of counsel would, itself, be a "separate and independent" constitutional claim).  In other words, to supply the "cause" excusing the procedural default, the ineffective assistance of counsel claim must, itself, have merit.  *See id*.; *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)

(finding that "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim").[5] Consequently, the analysis devolves into an evaluation, on the merits, of whether trial counsel was ineffective: to find cause, the Court must inquire as to the merits of the ineffective assistance of appellate counsel for failing to raise trial counsel's incompetence; to evaluate whether appellate counsel was incompetent for not raising the ineffectiveness of trial counsel, the Court must, in turn, examine if trial counsel was incompetent.

Regardless of the path to the merits, Jackson is not entitled to habeas relief on this ground. In order to show his trial counsel was ineffective, Jackson must show that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) the attorney's deficiencies resulted in prejudice to him. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). The Court's "responsibility is not to decide [itself] whether *Strickland*'s standards were met; it is instead to decide whether the state courts were unreasonable when they concluded that [petitioner's] ineffective assistance claim could not prevail." *Kerr v. Thurmer*, No. 09-1032, --- F.3d ----, 2011 WL 1105622, at *2 (7th Cir. Mar. 28, 2011) (citing *Richter*, 131 S. Ct. at 785). The analysis is "highly deferential" to the attorney, and assumes that the conduct at issue "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002). "[E]very effort" must be made to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and

---

[5]If Jackson's ineffective assistance of appellate counsel claim were procedurally defaulted, it could not supply the "cause" in the "cause and prejudice" test for the ineffective assistance of trial counsel claim. *See Edwards*, 529 U.S. 452-53. The Court expressly bypasses this issue below because, on the merits, Jackson did not show trial counsel was ineffective.

to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 688-89. The assumption is that "counsel made reasonable strategic choices unless the defendant presents evidence rebutting that presumption." *United States v. Traeger*, 289 F.3d 461, 472 (7th Cir. 2002). To meet the prejudice component of the *Strickland* test, Jackson must demonstrate "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Jackson cannot show the Illinois courts were unreasonable in their application of either prong of the *Strickland* test. As the Illinois appellate court found when it analyzed the merits of Jackson's ineffectiveness claim, Stewart testified at trial that McShane was the shooter, not Jackson. (Doc. 16-14 at 14.) That testimony was the result of investigation by counsel that Stewart had recanted his statement incriminating Jackson and had instead fingered McShane. Once Jackson's trial counsel found out that McShane visited Jackson in jail after the trial, counsel (1) secured a string of continuances before filing Jackson's motion for a new trial so that counsel could investigate McShane's confession and find McShane, Miles and Armfield; and (2) presented Armfield at the post trial hearing to testify to McShane's confession to Jackson. Nor was the Illinois court unreasonable in finding no prejudice. The jury heard the evidence that Jackson contends would have acquitted him: Stewart testified that "Rick Party" was the shooter. That the jury chose not to credit that testimony and acquit Jackson does not mean his counsel was ineffective.

## C.    Claim Three: Ineffective Assistance of Appellate Counsel

Jackson asserts that he received ineffective assistance of his appellate counsel on direct appeal because that counsel did not raise the ineffectiveness of his trial counsel. The State points

out that the Illinois appellate court found that Jackson procedurally defaulted on his ineffective assistance of appellate counsel claim because he "failed to allege in his postconviction petition that appellate counsel's failure to raise the inadequacy of the McShane investigation on direct appeal was incompetent." (Doc. 16-14 at 14.) Jackson argues that he did, in fact, raise the ineffectiveness of appellate counsel in his post-conviction petition in his final argument, captioned:

**PETITIONER ALSO ARGUES THAT HIS APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ARGUE TRIAL COUNSEL'S INEFFECTIVENESS ON DIRECT APPEAL.**

(Doc. 16-19 at 25; Doc. 20 at 8), which caption clearly indicates he raised the issue to the Supreme Court. He concedes, however, that "perhaps his petition is not well developed on this matter." (*Id.*) In effect, Jackson argues that his claim is not procedurally defaulted because it rests on *in*adequate state grounds, as the Illinois appellate court misapplied its own procedural rule, due to oversight or otherwise. *See e.g., Lee v. Kemna*, 534 U.S. 362, 376 (2002) (finding "[o]rdinarily, violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim. There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."); *see also Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004) (holding a petitioner fairly presents his federal claim to the state courts when he articulates both the operative facts and the controlling legal principles on which his claim is based). Even if Jackson fully developed the argument, the Court does not need to determine whether this is such an "exceptional" case like *Lee* or that the Illinois appellate court missed his argument because, as discussed above, this claim fails on the merits. His appellate counsel cannot be ineffective for failing to raise trial counsel's ineffectiveness if Jackson's trial counsel was, on the merits, not ineffective.

**D. Claim Four: Pleading Requirements for State Post-Conviction Petition**

Finally, Jackson asks the Court "to specify the pleading requirements for stating the gist of a *pro se* claim of ineffective assistance of appellate counsel." (Pet. at 22.) It appears that Jackson wants the Court to clarify what pleading standard Illinois courts should apply to initial petitions filed pursuant to the Illinois Post-Conviction Hearing Act. That is a question of state law for the state courts, not this Court. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (holding it "is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Jackson is not entitled to habeas relief on this ground.

**E. Certificate of Appealability**

"[U]ntil a [certificate of appealability] has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Section 2253 provides that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As discussed above, the Court analyzed the merits of the three grounds raised in Jackson's habeas petition that had any possible constitutional implications. No reasonable jurist could find that he is being held in violation of the federal constitution. The Court denies a certificate of appealability as to Jackson's petition.

## IV.    CONCLUSION

For the foregoing reasons, Jackson's petition for writ of habeas corpus is denied.  Though Jackson requests an evidentiary hearing in passing in his petition, there are no grounds under 28 U.S.C. § 2254(e)(2) to support such a hearing.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: April 11, 2011